IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CORPORATE RELOCATION, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:06-CV-232-L |
| | § | |
| ROBERT MARTIN, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER AND PRELIMINARY INJUNCTION

Before the court are the following motions:  Plaintiff's Application for Temporary Restraining Order and for Injunctive Relief (the "Application"), filed by Corporate Relocation, Inc. on February 7, 2006, as part of Plaintiff's Original Complaint and Application for Temporary Restraining Order and for Injunctive Relief; Defendant's Rule 12(b)(1) Motion to Dismiss and to Compel Arbitration, filed by Robert Martin on February 28, 2006; and a Motion for Leave to File Plaintiff's First Amended Complaint ("motion for leave"), filed by CRI on June 5, 2006.  Upon careful consideration of the motions, the briefing and appendices, and applicable law, the court **denies** Plaintiff's Motion for Leave to File Plaintiff's First Amended Complaint; **grants in part** and **denies in part** Defendant's Rule 12(b)(1) Motion to Dismiss and to Compel Arbitration; and **grants in part** and **denies in part** Plaintiff's Application for Temporary Restraining Order and for Injunctive Relief.

I.      **Factual and Procedural Background**

A.      **Factual Background**

Corporate Relocation, Inc. ("Plaintiff" or "CRI") filed this diversity action against Robert Martin ("Defendant" or "Martin") on February 7, 2006, and asserts a claim for breach of contract and seeks injunctive relief.  CRI is a Texas corporation registered and authorized to do business in the State of Texas, with its principal place of business in Addison, Texas.  CRI employed Martin, a Florida resident, in various capacities from July 8, 2002, until the employment relationship ended on February 1, 2006.  This case centers upon the Second Amended and Restated Executive Employment Agreement (the "Employment Agreement"), executed by Martin and CRI on May 15, 2005.[1]  Among other things, the Employment Agreement made Martin the President and Chief Executive Officer of CRI.  The parties executed and performed the Employment Agreement in Texas, where Martin was employed until his move to Florida in July 2005.  Martin remained a CRI employee while living in Florida, but with reduced duties, until the employment relationship ended on February 1, 2006.  Section 5 of the Employment Agreement, which contains a confidentiality/non-disclosure covenant and a return of property covenant, provides:

5.  Confidential Information. The Executive agrees that:

(a)     . . . . [H]e shall keep secret and confidential indefinitely all non-public information (including, without limitation, information regarding customers, employees, compensation levels, litigation and pending litigation) concerning the Company and its affiliates which was acquired by or disclosed to the Executive during the course of his employment with the Company or during the course of his consultation with the Company following his termination

_____

[1]The parties executed two prior employment agreements: (1) an Executive Employment Agreement on June 15, 2002, and (2) an Amended and Restated Executive Employment Agreement on June 24, 2004.  The Employment Agreement, the last written agreement memorializing the terms of Martin's employment, provides that it "supersedes all other agreements, both oral and written," between the parties.  Def.'s App. to Mot. to Dismiss & to Compel Arb. ("Def.'s App.") 11.

**Memorandum Opinion and Order and Preliminary Injunction - Page 2**

of employment and not to disclose the same, either directly or indirectly, to any other person, firm, or business entity, or to use it in any way.

(b)     Upon his Termination Date or at the Company's earlier request, he will promptly return to the Company any and all records, documents, physical property, information, computer disks or other materials relating to the business of the Company and its affiliates obtained by him during his course of employment with the Company.

Def.'s App. 8.  Section 6 of the Employment Agreement, which contains non-solicitation and

noncompetition covenants, provides:

6.  <u>Noncompetition</u>.  During the Noncompetition Period (as defined below), the Executive agrees that he will not directly or indirectly engage in, assist, perform services for, establish or open, or have any equity interest . . . in any person, firm, corporation, or business entity (whether as an employee, officer, director, agent, security holder, creditor, consultant, or otherwise) that engages in the business of providing corporate relocation services . . . . For purposes of this Agreement, the "Noncompetition Period" shall be the period while the Executive is employed by the Company and for the two years period following the Executive's Termination Date . . . . Whether or not the Noncompetition Period has expired, the Executive agrees that he will not solicit then current and pending customers of the Company (except on behalf of the Company).  After the Noncompetition Period, the Executive agrees that he will not directly or indirectly open, or have any equity interest in . . . or be an employee or officer of, any person, firm, corporation, or business entity that engages in the business of providing corporate relocation services.

Def.'s App. 9.

CRI contends that Martin has breached, or has threatened to breach, Sections 5 and 6 of the

Employment Agreement.  According to CRI, Martin informed the company that he intends to work

for a competitor and intends to share confidential information with third parties.  CRI also contends

that Martin has in his possession, and refuses to return 24 "client" files which it claims are company

property and represent thousands of dollars in potential revenue.[2]  It requests the court to issue

---

[2]At the March 14, 2006 hearing, the court learned that the 24 files contained information for prospective clients, not clients.  CRI uses the numbers 24 and 25 interchangeably throughout its Application and briefing, but made clear at the hearing that it alleges Martin refuses to return *24 prospective client files*.

**Memorandum Opinion and Order and Preliminary Injunction - Page 3**

"injunctive relief, including [a] temporary restraining order, a temporary injunction and a permanent injunction," enjoining Martin from committing the following conduct:

- Directly or indirectly disclosing or using in any manner CRI's trade secrets, and other confidential or proprietary information;
- Calling on, soliciting, or transacting business with clients or potential clients of CRI during the time Martin was employed by CRI;
- Destroying, discarding, or erasing any documents or materials (whether in hard copy or electronic format) regarding CRI's confidential or proprietary information, or trade secrets;
- Destroying, discarding, erasing, or modifying the 24 prospective client files alleged to be in Martin's possession.

Pl.'s Application ¶ 5.13.[3]   CRI also requests that the court order Martin to provide all CRI documents and material in his possession, custody, or control, including the 24 prospective client files, to CRI's counsel within five days receipt of an order issuing injunctive relief.  *Id.* ¶ 5.14.

Martin opposes the Application.  He contends that CRI filed its claims for breach of contract and for injunctive relief in this court without first submitting them to arbitration, as mandated by the Employment Agreement.  Section 15 of the Employment Agreement contains an arbitration clause, which provides, in relevant part:

15.  Arbitration.  Any dispute, claim or controversy relating to or arising out of this Agreement (or breach thereof) shall be settled by final, binding and non-appealable arbitration before the American Arbitration Association . . . with the hearing to be held in Chicago, Illinois.  This Section 15 shall not be construed to limit the Company's right to obtain relief under Section 7 with respect to any matter or controversy subject to Section 7 . . . .

Def.'s App. 11.  Section 7 of the Employment Agreement contains an "Equitable Remedies" clause, which provides:

---

[3]The court treats CRI's Application as an application for preliminary injunction.  As the parties have been fully heard and the issues fully briefed, no purpose would be served or furthered by the issuance of a temporary restraining order.  Moreover, a temporary injunction is a Texas state remedy not contemplated by Fed. R. Civ. P. 65.

**Memorandum Opinion and Order and Preliminary Injunction - Page 4**

7. <u>Equitable Remedies</u>. The Executive acknowledges that the Company would be irreparably injured by a violation of Sections 5 and 6 [titled "Confidential Information" and "Noncompetition" respectively] and agrees that the Company, in addition to other remedies available to it for such breach or threatened breach, shall be entitled to a preliminary injunction, temporary restraining order, other equivalent relief, restraining the Executive from any actual or threatened breach of Sections 5 and 6 without any bond or other security being required. The Executive will also return the monthly bonus paid to him for the non-compete.

Def.'s App. 9.

Martin seeks the court to compel CRI's claims for breach of contract and injunctive relief to arbitration pursuant to Section 15. He contends that this court is precluded from issuing injunctive relief because the Employment Agreement, particularly Sections 15 and 7, mandates the parties to arbitrate their dispute. Alternatively, Martin argues that, in the event the court permits CRI to pursue injunctive relief in this forum, CRI cannot establish the elements required for entry of such relief. CRI counters, contending that it has a right under the Employment Agreement to seek injunctive relief in this court, and that such relief should be granted.

### B. Procedural Background

CRI filed its Application on February 7, 2006. Martin filed his motion to dismiss and to compel arbitration on February 28, 2006. On March 7, 2006, pursuant to 28 U.S.C. § 636(b), and an order of the court in implementation thereof, Martin's motion to dismiss and to compel arbitration was referred to the United States Magistrate Judge for proposed findings and recommendations. Thereafter, on March 14, 2006, this court conducted a hearing regarding CRI's Application.

The Findings and Recommendation of the United States Magistrate Judge (the "Report") was issued on April 26, 2006. The magistrate judge found that Sections 15 and 7 of the Employment Agreement explicitly contemplate that this court may issue injunctive relief pending arbitration. He recommended that the court deny Martin's Motion to Dismiss brought pursuant to Fed. R. Civ. P.

12(b)(1) and take under advisement Martin's Motion to Compel Arbitration until the court determines whether to issue a temporary restraining order or preliminary injunction. Further, he recommended that after the court decides whether to issue injunctive relief, it should compel arbitration and either stay the proceedings pursuant to 9 U.S.C. § 3 and Tex. Civ. Prac. & Rem. Code § 171.025, or dismiss this action. *See* Report at 8. The parties filed no written objections to the Report.

On June 5, 2006, CRI filed its Motion for Leave to File Plaintiff's First Amended Complaint, to which it attached its proposed First Amended Complaint and Application for Temporary Restraining Order and for Injunctive Relief. Plaintiff requests leave to assert six new claims against Martin and to add proposed new defendant Mark Dull.[4] CRI contends that Dull is a former CRI employee who resigned on March 10, 2006. Mot. for Leave Ex. A ¶¶ 3.07, .09. According to CRI, Dull resides in Hills, Iowa, and is currently employed by Relocation Synergy Group, a competitor of CRI, performing the same sales job he held while working for CRI. *Id.* ¶ 1.03, 3.09. The court now considers the issues presented.

## II.    Analysis

### A.    Plaintiff's Motion for Leave to File Plaintiff's First Amended Complaint

The appropriate starting point for amendment of pleading is Fed. R. Civ. P. 15(a). Rule 15(a) provides:

> A party may amend the party's pleading once as a matter of course any time before
> a responsive pleading is served . . . . Otherwise, a party may amend the party's

---

[4]CRI seeks leave to assert the following additional claims against Martin: (1) breach of fiduciary duty; (2) civil theft; (3) conversion; (4) extortion; (5) civil conspiracy; and (6) tortious interference. *See* Mot. for Leave Ex. A ¶¶ 5.15-.44. In addition, CRI seeks leave to bring the following claims against proposed Defendant Mark Dul1: (1) breach of contract; (2) application for injunctive relief; (3) civil conspiracy; (4) tortious interference. *See id.* ¶¶ 5.01-.14, 5.37-.44.

pleading only by leave of court or by written consent of the adverse party; and leave
shall be freely given when justice so requires.

Fed. R. Civ. P. 15(a). Decisions concerning motions to amend are entrusted to the sound discretion of the district court. *Smith v. EMC Corp.*, 393 F.3d 590, 595 (5th Cir. 2004). Rule 15(a) evinces a bias in favor of granting leave to amend, and a district court must possess a "substantial reason" to deny a request for leave to amend. *Id.* (citation omitted). "Although leave to amend under Rule 15(a) is to be freely given, that generous standard is tempered by the necessity of a district court to manage a case." *Schiller v. Physicians Res. Group Inc.*, 342 F.3d 563, 566 (5th Cir. 2003). In other words, leave to amend under Rule 15 is by no means automatic. *Southern Constructors Group, Inc. v. Dynalectric Co.*, 2 F.3d 606, 612 (5th Cir. 1993).

In deciding whether to grant leave to amend, the court may consider a variety of factors, including undue delay, bad faith or dilatory motive on the part of the movant, repeated failures to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, and futility of the amendment. *Schiller*, 342 F.3d at 566; *see also Foman v. Davis*, 371 U.S. 178, 182 (1962). Courts have made clear that the language in Rule 15(a) affording parties an amendment "once as a matter of course" before the filing of a responsive pleading does not provide an absolute right to substantively amend their original complaint to cure any pleading defects, as the district court retains the authority to decide whether to grant leave. *See McKinney v. Irving Indep. Sch. Dist.*, 309 F.3d 308, 315 (5th Cir. 2002) (holding that the district court did not abuse its discretion by denying plaintiff's attempt to amend as a matter of course), *cert. denied*, 537 U.S. 1194 (2003); *In re Capstead Mortgage Corp. Sec. Litig.*, 3:98-CV-698-L, 2003 WL 22221320, at *2 (N.D. Tex. Sept. 19, 2003).

CRI contends that the court should grant leave to amend in order to decide the case on a more complete record of the merits of CRI's position.  It states that the proposed additional claims are the result of facts learned through the deposition of Mark Dull, which occurred on April 20, 2006, after it filed its Application.  Martin counters that CRI's motion has caused, and will continue to produce, undue delay, since the motion comes after the Magistrate Judge issued the Report recommending the court to grant his motion to compel arbitration.  Martin also contends that he would suffer undue prejudice because the First Amended Complaint, if allowed, "may create a potential conflict of interest for Martin's counsel."  Def.'s Resp. to Pl's Mot. for Leave ¶ 4.

The court concludes that substantial reasons exist to deny CRI leave to file its proposed amended complaint.  Even when the court accepts as true that CRI first learned of the information underlying the new allegations on April 20, 2006, and therefore could not have asserted the proposed claims in its original Application, CRI's motion for leave is untimely in light of the procedural posture of this action.  *See Mayeaux v. Louisiana Health Serv. & Indem. Co.*, 376 F.3d 420, 427 (5th Cir. 2004).  CRI's failure to file its motion for leave before the Report issued can perhaps be explained, since the Report issued six days after CRI learned of the information prompting it to propose additional claims.  The court, however, cannot understand  why CRI did not object to the Report, as well as why CRI waited until June 5, 2006, nearly seven weeks after Dull's deposition and six weeks after the Report issued, before filing its motion for leave.

In light of the Report, and CRI's delayed filing, the court cannot help but conclude that CRI proposes new theories seriatim as a tactical maneuver to avert the real possibility that this action will be compelled to arbitration.  *Cf. Southern Constructors Group, Inc.*, 2 F.3d at 612 ("[A] district court need not subject itself to the presentation of theories  seriatim . . . .").  The six proposed new

**Memorandum Opinion and Order and Preliminary Injunction - Page 8**

claims against Martin relate only indirectly to the Employment Agreement, and may easily be viewed as attempts to avoid the arbitration provision found at Section 15.  From the moment Martin filed his Motion to Dismiss and to Compel Arbitration, CRI was on notice that its complaint might not be sufficient to withstand this action being compelled to arbitration.  CRI made the strategic decision to stand on its Application as filed until nearly six weeks after the Report issued, even though it had been long apprised of Martin's argument that the breach of contract claim is arbitrable.  The court cannot allow CRI to benefit from its "wait and see" approach as to whether it will request leave to amend, *see Goldstein v. MCI Worldcom*, 340 F.3d 238, 255 n.6 (5th Cir. 2003), where the result, and the apparent intent, is to challenge the effect of the Report.

The court also determines that amendment is not warranted because it would cause undue delay and would be an inefficient use of the parties' and the court's resources.  Delay is "undue" if, among other things, it "impose[s] unwarranted burdens on the court."  *Mayeaux*, 376 F.3d at 427.  The court has already expended scarce judicial resources conducting a hearing on CRI's Application, as has the magistrate judge by issuing the Report.  To allow amendment under the present circumstances would reward CRI for its delay, and burden the court by rendering useless the resources it has expended.[5]

Finally, the court is mindful that granting leave to amend unnecessarily raises a question whether a conflict of interest would exist between Martin's counsel and certain employees of Relocation Synergy Group, including proposed Defendant Dull, that could cause prejudice to

---

[5]Although CRI attached its proposed First Amended Complaint and Application for Temporary Restraining Order and for Injunctive Relief to its motion for leave, it did not attach the employment agreement covering proposed Defendant Dull, or otherwise set forth relevant excerpts from such agreement in its proposed amended complaint.  Moreover, CRI did not inform the court whether its proposed claims are arbitrable.  In light of the Report, CRI's delay in filing its motion for leave, and an absence of necessary information in the proposed amended complaint, the court determines that to grant leave would be an inefficient use of the parties' and the court's resources and a tremendous burden in effective management of this action.

**Memorandum Opinion and Order and Preliminary Injunction - Page 9**

Martin.[6]  In addition to the reasons set forth above, the risk of undue prejudice to Martin by virtue of permitting an amended pleading is a factor relevant to the court's decision to deny CRI's motion for leave.  Given the procedural posture of this action and the risk of undue delay, the court is satisfied that, pursuant to its power to manage this action, *see Schiller*, 342 F.3d at 566, it acts well within its discretion by denying CRI's motion for leave.  Accordingly, the court will deny Plaintiff's Motion for Leave to File Plaintiff's First Amended Complaint.

### B.      Defendant's Rule 12(b)(1) Motion to Dismiss and to Compel Arbitration

### 1.      Rule 12(b)(1) Motion to Dismiss

Martin originally contended that the court should dismiss CRI's claims because it lacks subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1).  The Federal Arbitration Act is not an independent grant of federal jurisdiction.  *Smith v. Rush Retail Ctrs., Inc.*, 360 F.3d 504, 505 (5th Cir.), *cert. denied*, 543 U.S. 876 (2004).  A court must have subject matter jurisdiction before it may compel arbitration.  *Id.*  At the March 14, 2006 hearing, Martin acknowledged that the court possesses subject matter jurisdiction over this action.  Moreover, in his Report, the magistrate judge found that this court has jurisdiction pursuant to 28 U.S.C. § 1332.  *See* Report at 1.  In light of Martin's acknowledgment, and the Report, the court determines that the magistrate judge's finding and conclusion that Martin's motion to dismiss should be denied is correct and accepts it as that of the court.  Accordingly, the court will deny Martin's Rule 12(b)(1) Motion to Dismiss.

---

[6]In his briefing, Martin explains that CRI and Relocation Synergy Group, which currently employs Dull, were involved in previous litigation, where CRI was represented by its current counsel and Martin's counsel represented certain individuals employed by Relocation Synergy Group.  CRI counters that any potential conflict is illusory since only Dull, and not Relocation Synergy Group, is a party to the present litigation.

**Memorandum Opinion and Order and Preliminary Injunction - Page 10**

## 2.      Motion to Compel Arbitration

Martin contends that CRI's breach of contract claim clearly falls within the scope of Section 15 of the Employment Agreement and is therefore arbitrable.  He also contends that this court should decline to entertain the Application for injunctive relief, and argues that, while Sections 15 and 7 do not preclude CRI from obtaining equitable and injunctive relief, the arbitral forum is the sole place the Employment Agreement permits a party to seek such relief.  CRI, though relatively silent regarding its breach of contract claim, contends that it has a right under the Employment Agreement to pursue its Application in this court.  In contends that Section 7, when read in conjunction with Section 15, renders its Application outside the scope of Section 15, and therefore expressly excludes injunctive relief from the arbitral forum.

To adjudicate a motion to compel arbitration under the Federal Arbitration Act (the "FAA"),[7] courts conduct a two-step inquiry.  The first step is to determine whether the parties agreed to arbitrate the dispute in question.  *Webb v. Investacorp, Inc.*, 89 F.3d 252, 258 (5th Cir. 1996).  The second step is to determine whether any statute or policy renders the dispute non-arbitrable. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985); *Webb*, 89 F.3d at 258.  The first step involves two considerations: "(1) whether there is a valid agreement to

---

[7]CRI has intimated that the court should apply the Texas General Arbitration Act ("TGAA"), Tex. Civ. Prac. & Rem. Code § 171, because the Employment Agreement contains Section 17, a general choice-of-law provision, providing that "[t]his Agreement shall be construed in accordance with the laws of the State of Texas."  Def.'s App. 11. The court disagrees.  In general, arbitration under non-FAA rules is permitted "if a contract expressly references state arbitration law, or if its arbitration clause specifies with certain exactitude how the FAA rules are to be modified." *Action Indus., Inc. v. United States Fid. & Guar. Co.*, 358 F.3d 337, 341 (5th Cir. 2004).  The Employment Agreement does not expressly reference the TGAA, and Sections 15 and 7 in no way modify or replace the FAA's rules.  *See id.* at 343 n.16. The Fifth Circuit instructs that the parties' intent to replace the FAA should be gleaned from their agreement.  *See id.* at 341; *Prescott v. Northlake Christian Sch.*, 369 F.3d 491, 497 n.10 (5th Cir. 2004) (explaining that modification must be premised on more than "a general choice-of-law provision or a vague reference to a particular state's arbitration statute.").  The parties' possible intent to apply the TGAA cannot be gleaned from Section 17 or 15, since the provisions do not even vaguely reference the TGAA.  *Cf. id.*; *Action Indus., Inc.*, 358 F.3d at 341.  Moreover, the magistrate judge applied the FAA in his Report, and neither party objected.  The court agrees with the magistrate judge that the FAA applies.

arbitrate between the parties, and if so, (2) whether the dispute in question falls within the scope of the arbitration agreement." *OPE Int'l LP v. Chet Morrison Contractors, Inc*., 258 F.3d 443, 445 (5th Cir. 2001); *Webb*, 89 F.3d at 258.  To resolve these issues, courts apply ordinary state law principles governing contract formation.  *Id*. at 445-46; *Webb*, 89 F.3d at 258.  The FAA establishes that, as a matter of federal law, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration," including when "the problem at hand is the construction of the contract language itself . . . ."  *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp*., 460 U.S. 1, 24-25 (1983); *OPE Int'l LP*, 258 F.3d at 445.

The court now addresses whether the breach of contract claim and the application for injunctive relief should be compelled to arbitration.  Although CRI's Application is an independent claim, the underlying facts and assertions in the Application parallel those made in the breach of contract claim.  In essence, CRI's Application functions as a request for injunctive relief concerning its breach of contract claim.  The court first addresses whether CRI's claim for breach of contract, alleging breaches or threatened breaches of Sections 5 and 6 of the Employment Agreement, should be arbitrated.  Turning to the first step, it is undisputed that the Employment Agreement contains a valid agreement to arbitrate.  *See* Def.'s Mot. to Dismiss & to Compel Arb. at 5; Pl.'s Resp. at 5.

The court now proceeds to determine whether CRI's breach of contract claim falls within the scope of the arbitration agreement.  The claim, centering upon Martin's alleged breaches or threatened breaches of the confidentiality and noncompete provisions contained in the Employment Agreement, qualifies as a "dispute, claim or controversy relating to or arising out of this Agreement (or the breach thereof)," and therefore, pursuant to the Employment Agreement, "shall be settled by

final, binding, and non-appealable arbitration . . . ." Def.'s App. 11.[8]  Moreover, CRI has not contested whether the breach of contract claim is arbitrable.  Accordingly, the court determines that the parties agreed to arbitrate the breach of contract dispute.  *See Webb*, 89 F.3d at 258.

The court now addresses the second step, and determines that there is no statute or policy preventing CRI's breach of contract from going to arbitration.  The court, therefore, will compel CRI's breach of contract claim to arbitration, and will either stay this action pursuant to 9 U.S.C. § 3 or dismiss it pursuant to *Alford v. Dean Witter Reynolds, Inc.*, 975 F.2d 1161, 1164 (5th Cir. 1992) ("[W]hen *all* of the issues raised in the district court must be submitted to arbitration," the court may dismiss the action with prejudice.) (emphasis in original).

The court must now determine whether CRI's Application for injunctive relief should be compelled to arbitration or be entertained by this court.  The FAA does not preclude a court from issuing injunctive relief, including a preliminary injunction, to preserve the status quo during the process of arbitration, where the contract at issue reflects a consensus of the parties that such relief was contemplated.  *RGI, Inc. v. Tucker & Assocs., Inc.*, 858 F.2d 227, 230 (5th Cir. 1988); *Ruscitto v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 777 F.Supp. 1349, 1353 (N.D. Tex. 1991), *aff'd*, 948 F.2d 1286 (5th Cir. 1991) (table), *cert. denied*, 504 U.S. 930 (1992); *Speedee Oil Change Sys., Inc. v. State Street Capital, Inc.*, 727 F.Supp. 289, 291 (E.D. La. 1989).

---

[8]The Fifth Circuit distinguishes broad and narrow arbitration clauses.  If the arbitration provision is "broad," the arbitrator, not the court, should decide whether a particular dispute falls within the scope of the agreement to arbitrate.  *In re Complaint of Hornbeck Offshore*, 981 F.2d 752, 755 (5th Cir. 1993).  Courts generally hold that arbitration clauses purporting to cover "any dispute" between the parties arising out of a contract are "broad."  *Id.* Although Section 15 contains the "[a]ny dispute" language typical of a broad clause, it explicitly and unambiguously provides that a claim relating to or arising out of a "breach thereof" of the Employment Agreement is arbitrable.  *See* Def.'s App. 11.  The court agrees with the magistrate judge's implicit finding and conclusion that the arbitration agreement at issue is sufficiently narrow for the court to determine whether the agreement covers the breach of contract dispute.

The court determines that Sections 15 and 7 of the Employment Agreement, when read conjunctively, permit CRI to pursue injunctive relief in a court of law pending arbitration of a dispute arising out of the Employment Agreement.[9]  The facts presented in this action are similar to those in *Speedee Oil Change*.  In that case, plaintiff claimed that defendant had breached a franchise agreement, and sought injunctive relief to enjoin defendant from continuing to commit the alleged breaches.  *See Speedee Oil Change Sys*., *Inc*., 727 F.Supp. at 290.  The court held that, although the arbitration clause at issue did not mention or consider the use of a court-ordered injunction, it had the authority to issue a preliminary injunction to preserve the status quo pending arbitration.  *Id*. at 291-92.

In the Employment Agreement in this action, Sections 15 and 7 contemplate the issuance of "a preliminary injunction, temporary restraining order, [or] other equivalent relief . . . . ," but do not explicitly provide that such relief may be sought in a court of law.  *See* Def.'s App. 9.  As the specific forms of injunctive relief enumerated in Section 7 are available in a federal district court pursuant to Fed. R. Civ. P. 65, the court is satisfied that the language contained in Section 7, as well as the mere presence of Section 7 in the Employment Agreement, sufficiently reflects that the parties contemplated the issuance of injunctive relief in a district court to preserve the status quo pending arbitration.  *See RGI*, *Inc*., 858 F.2d at 230; *Ruscitto*, 777 F.Supp. at 1353.  Accordingly, the court will grant Martin's Motion to Compel Arbitration to the extent that he requests the court to compel

---

[9]The court determines that CRI, through its Application, seeks the court to preserve the environment of the breach of contract dispute during the arbitration process.  *Cf. Speedee Oil Changes Sys*., *Inc*., 727 F.Supp. at 290.  The court therefore interprets CRI's Application as a request for the court to invoke its authority to issue injunctive relief pending possible arbitration.  *See RGI*, *Inc*., 858 F.2d at 229.  Accordingly, the breach of contract dispute, as the underlying claim, is the only dispute to be arbitrated; this court will decide whether injunctive relief should issue pending arbitration of the breach of contract dispute.  To the extent that the magistrate judge recommends that the court compel to arbitration CRI's Application for injunctive relief, as well as its breach of contract claim, and then decide whether to issue injunctive relief to preserve the status quo pending the arbitrator's resolution of both claims, the court disagrees.

**Memorandum Opinion and Order and Preliminary Injunction - Page 14**

CRI's breach of contract claim to arbitration, but it will entertain CRI's Application for injunctive relief in this forum.

Section 3 of the Federal Arbitration Act provides that when claims are properly referable to arbitration, upon application of one of the parties, the court shall stay trial of the action until the arbitration is complete. *See* 9 U.S.C. § 3; *Alford*, 975 F.2d at 1164.[10] Although a stay is mandatory, the Fifth Circuit has held that the FAA "was not intended to limit dismissal of a case in the proper circumstances." *Fedmet Corp. v. M/V Buyalyk*, 194 F.3d 674, 678 (5th Cir. 1999) (quoting *Alford*, 975 F.2d at 1164). A district court is not precluded from dismissing an action where all issues are properly subject to arbitration. *Id.*; *Alford*, 975 F.2d at 1164. As the court will compel arbitration of CRI's breach of contract claim, but will entertain CRI's Application for injunctive relief in this forum, all issues are not properly subject to arbitration. Accordingly, dismissal of this action is inappropriate, *see Fedmet Corp.*, 194 F.3d at 678; *Alford*, 975 F.2d at 1164; the court will instead stay the proceedings pursuant to 9 U.S.C. § 3.

C.      **Plaintiff's Application for Injunctive Relief**

The court must now decide whether a preliminary injunction should issue to preserve the status quo pending resolution of CRI's breach of contract claim in arbitration. There are four prerequisites for the extraordinary relief of a temporary restraining order or preliminary injunction. To prevail, Plaintiff must demonstrate: (i) a substantial likelihood of success on the merits; (ii) a substantial threat of immediate and irreparable harm for which it has no adequate remedy at law; (iii) that greater injury will result from denying the preliminary injunction than from its being granted;

---

[10]Neither party filed a formal motion to stay proceedings pending arbitration. In his motion to dismiss and to compel arbitration, however, Martin requests the court to stay or dismiss the proceedings. Accordingly, the court treats Defendant's Rule 12(b)(1) Motion to Dismiss and to Compel Arbitration as including a motion to stay proceedings pending arbitration.

**Memorandum Opinion and Order and Preliminary Injunction - Page 15**

and (iv) that a temporary restraining order will not disserve the public interest.  *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987); *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974) (*en banc*).  The party seeking such relief must satisfy a cumulative burden of proving each of the four elements enumerated before a temporary restraining order or preliminary injunction can be granted.  *Mississippi Power and Light Co. v. United Gas Pipeline,* 760 F.2d 618, 621 (5th Cir. 1985); *Clark*, 812 F.2d at 993.  Otherwise stated, if a party fails to meet *any* of the four requirements, the court cannot grant the temporary restraining order or preliminary injunction.

### 1.      Substantial Likelihood of Success on the Merits

In order to address whether CRI has demonstrated a substantial likelihood of success on the merits, the court must first determine the controlling substantive law.  As the Employment Agreement is governed by Texas choice of law rules, which apply Texas law to the instant facts, the court determines that Texas law governs.  *See DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 679 (Tex. 1990), *cert. denied*, 498 U.S. 1048 (1991); *see also Ruscitto*, 777 F.Supp. at 1353.  To prevail on its breach of contract claim, Plaintiff must establish (1) the existence of a binding contract; (2) that Martin breached the contract; and (3) that it suffered damages caused by Martin's alleged breach.  *See East Tex. Med. Ctr. Cancer Inst. v. Anderson*, 991 S.W.2d 55, 62 (Tex. App.–Tyler 1998, pet. denied).

Resolution of CRI's Application, based upon the underlying breach of contract claim, centers upon the nonsolicitation and noncompetition covenants contained in Section 6, and the confidentiality/nondisclosure and return of property covenants found in Section 5.  Tex. Bus. &

Com. Code Section 15.50 governs the enforceability of noncompetition and nonsolicitation[11] covenants, but does not govern or impair the enforceability of nondisclosure covenants. *Guy Carpenter & Co., Inc. v. Provenzale*, 334 F.3d 459, 465 (5th Cir. 2003).

CRI contends that Martin breached the Employment Agreement by seeking employment within the corporate relocation industry notwithstanding the terms of Section 6, and by violating or threatening to violate his obligation to protect CRI's confidential, nonpublic information and trade secrets, as well as failing to return all of CRI's property and information to CRI upon the end of the employment relationship, including the 24 missing prospective client files, in violation of Section 5(a)-(b).[12]

Martin counters that he has not breached Sections 5 or 6 of the Employment Agreement, and states, among other things, that he did not take the 24 missing prospective client files and does not possess them. At the March 14, 2006 hearing, Martin acknowledged that he had not returned a laptop computer and cellular telephone owned by CRI, which he stated were the only pieces of property he possesses that CRI owns. Finally, Martin contends that the noncompetition provision found at Section 6 is unenforceable as a matter of law and therefore is an unlawful restraint on trade

---

[11]A provision restricting solicitation of former employees and customers restrains trade and constitutes a covenant not to compete. *Olander v. Compass Bank*, 172 F.Supp.2d 846, 851 (S.D. Tex. 2001), *aff'd*, 44 Fed. Appx. 651 (5th Cir. 2002).

[12]At the March 14, 2006 hearing, CRI also contended that Martin failed to cooperate in defense of claims against it in breach of Section 8 of the Employment Agreement. The court learned that CRI is involved in litigation with Americorp a/k/a Altair, one of its competitors. CRI alleges that Martin contacted Altair shortly after his employment relationship with CRI ended. It also alleges that Martin encouraged CRI employees to be deposed in the Altair litigation, and that he disclosed and is disclosing CRI's confidential and proprietary information to Altair, including information regarding a tax issue. As CRI did not allege breach of the defense of claims provision in its complaint, the court will not consider the defense of claims provision as a separate instance of breach of contract. The court will consider Martin's contacts with Altair as they relate to CRI's contention that Martin breached the confidentiality/nondisclosure covenant and the return of property covenant contained in Section 5 of the Employment Agreement.

**Memorandum Opinion and Order and Preliminary Injunction - Page 17**

pursuant to Tex. Bus. & Com. Code § 15.05(a).  The court first addresses the nonsolicitation and noncompetition covenants.

### a.        Nonsolicitation and Noncompetition Covenants

CRI contends that Martin is actively seeking employment in the corporate relocation industry in violation of the noncompete provision.  It proffered a declaration of James Curtis, founder and former Chief Executive Officer of CRI, in which Curtis avers, among other things, that Martin informed him that he was going to work for Cendant Relocation, another relocation company, starting March 1, 2006.  Martin acknowledges that he spoke with Curtis, but denies making the alleged statement.

The enforceability of a covenant not to compete, including whether a covenant is a reasonable restraint of trade, is a question of law for the court.  *Light v. Centel Cellular Co. of Tex.*, 883 S.W.2d 642, 644 (Tex. 1994).  Under Texas law:

> a covenant not to compete is enforceable if [1] it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made [and 2] contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee.

Tex. Bus. & Com.Code Ann. § 15.50(a) (Vernon 2002).  Regarding the formation of the covenant not to compete, section 15.50 requires the court make two initial inquiries: (1) is there an otherwise enforceable agreement, to which (2) the covenant not to compete is ancillary to or a part of at the time the agreement is made.  *Light*, 883 S.W.2d at 644.

The court first turns to whether an otherwise enforceable agreement exists, and begins by resolving whether Martin was an at-will employee of CRI.  "Texas law permits indefinite employment to be terminated at-will and without cause unless the termination results from the

employee's refusal to commit an unlawful act." *White v. FCI USA, Inc.*, 319 F.3d 672, 676 (5th Cir.

2003). "The long-standing rule in Texas provides for employment at will, terminable at any time

by either party, with or without cause, absent an express agreement to the contrary." *Federal

Express Corp. v. Dutschmann*, 846 S.W.2d 282, 283 (Tex. 1993). Although Section 1 of the

Employment Agreement provides for an employment period as the President and Chief Executive

Officer from May 15, 2005 until January 2, 2006, a definite term, a reading of the document in its

entirety clearly contemplates that Martin could be terminated without cause. For example, Section

3(d) is titled "Termination by the Company for Reasons Other Than Cause," Def.'s App. 7, and this

clearly evinces a meeting of the minds between the parties that cause did not have to exist for

Martin's termination. Section 3(d) does not enumerate reasons that could otherwise lead to

termination or explain when such reasons could be applied, and therefore does not limit "the

employer's right to terminate the employee in a meaningful and special way." *Strickland v.

Medtronic, Inc.*, 97 S.W.3d 835, 838 (Tex. App.–Dallas 2003, pet. dism'd w.o.j.). Accordingly, the

court determines that the Employment Agreement created an at-will employment relationship.[13]

Generally, an at-will employment relationship standing alone is not an otherwise enforceable

agreement because neither the employer nor the employee is bound to continue the relationship. *See

Light*, 883 S.W.2d at 644. Otherwise enforceable agreements can emanate from at-will employment,

however, so long as the consideration for any promise forming such agreements is not illusory. *See

id.* at 645; *see also Carson v. Dynergy, Inc.*, 344 F.3d 446, 452 (5th Cir. 2003). Consideration for

---

[13]The clear import of the Employment Agreement, in spite of the definite term, is that Martin's employment as President and CEO would not continue beyond January 2, 2006, but could be terminated for reasons other than cause prior to such date. The parties' dispute whether Martin was terminated or resigned evidences that an at-will employment relationship existed because it implies that the Employment Agreement lacked clear circumstances regarding specific grounds for termination.

a promise, by either the employee or the employer in at-will employment, is illusory if it is dependent on a period of continued employment. *Carson*, 344 F.3d at 452; *Light*, 883 S.W.2d at 644. "When illusory promises are all that support a purported bilateral contract, there is no contract." *Carson*, 344 F.3d at 452; *Light*, 883 S.W.2d at 645. Regarding the existence of an otherwise enforceable agreement, "the relevant point in time is the moment the agreement is made; the issue is whether, at the time the agreement is made, there exists other mutually binding promises to which the covenant not to compete is ancillary or part and parcel." *Olander v. Compass Bank*, 172 F.Supp.2d 846, 851 (S.D. Tex. 2001) (citation and quotations omitted), *aff'd*, 44 Fed. Appx. 651 (5ᵗʰ Cir. 2002).

In this case, the court determines that the Employment Agreement contains non-illusory promises serving as consideration made by both parties that satisfy *Light*'s "otherwise enforceable agreement" test. To the extent, however, that CRI contends that its promise to pay Martin noncompetition bonuses serves as consideration capable of supporting an otherwise enforceable agreement, the court disagrees. CRI's promise to give Martin a "non-competition bonus amount of $2,500 each month during the Employment Period," as set forth in Section 2(h) of the Employment Agreement, *see* Def.'s App. 6, is illusory because such payments are contingent upon further employment. *Cf. Light*, 883 S.W.2d at 644.[14] In addition, although Martin made a non-illusory promise not to disclose confidential information acquired during his employment, nowhere in the Employment Agreement did CRI explicitly promise to provide Martin confidential information at the time of, or shortly after, its execution. *See Light*, 883 S.W.2d at 647 n.14; *Olander*, 172

---

[14]Such determination is supported by the testimony of Ms. Kathy Curtis, CRI's Chief Financial Officer, who testified at the March 14, 2006 hearing that Martin received approximately $60,000 in noncompetition bonuses during his employment.

**Memorandum Opinion and Order and Preliminary Injunction - Page 20**

F.Supp.2d at 854 (finding no "otherwise enforceable agreements" under *Light* where "the confidentiality provisions at issue did not obligate [the employer] to provide any confidential information in exchange for [the employee's] promise.").[15]  Moreover, contrary to CRI's assertions, the record is devoid of evidence that CRI provided new or additional confidential information to Martin *at the time* the parties executed the Employment Agreement, or shortly thereafter.  The court rejects CRI's contention that Martin received new or additional confidential information at the time of execution merely because the Employment Agreement included Section 1(a)(1), a provision not included in the parties' previous employment agreements which provided that Martin was to assume new responsibilities for recruiting and hiring executive management personnel.

The Employment Agreement, however, does contain non-illusory promises made by the parties capable of serving as "otherwise enforceable agreements."  CRI's promise to make a lump sum payment if it terminated Martin for a reason other than "Cause," as set forth in Section 3(d) of the Employment Agreement, *see* Def.'s App. 7, is a non-illusory promise.  *See Guy Carpenter & Co., Inc.*, 334 F.3d at 465 (holding employer's promise to pay a designated severance if it terminated the employee without good cause was non-illusory).  Similarly, CRI's promise to make a minimum

---

[15]The Fifth Circuit has intimated that the "enforceability of non-solicitation agreements on whether an employer discloses confidential information at the time the employee signs an employment contract . . . . is not what *Light*, or § 15.50, intends or requires."  *Guy Carpenter & Co., Inc.*, 334 F.3d at 466.  *Guy Carpenter* involved a nondisclosure/noncompetition clause which explicitly provided that the employee would have access to confidential information, proprietary information, and/or trade secrets.  *Id.* at 462.  Unlike the agreement in *Guy Carpenter*, the Employment Agreement contains no explicit promise that Martin will receive or have access to confidential or proprietary information, or trade secrets, or that CRI would give such information to him.  In *Olander v. Compass Bank*, 363 F.3d 560 (5th Cir. 2004), a decision subsequent to *Guy Carpenter*, the court held that the district court did not err in declining to enforce a noncompete where, among other things, the nondisclosure provisions contained no explicit promise on the part of the employer to provide confidential information to the employee.  *See Olander*, 363 F.3d at 565.  The court distinguished *Guy Carpenter* on the basis that, among other things, "in *Guy Carpenter* the employer explicitly promised to provide confidential information to the employee."  *Id.* at 566 n.15.  The court is satisfied that, as Section 5 or any portion of the Employment Agreement does not contain an explicit promise by CRI to provide confidential information to Martin, the confidentiality/nondisclosure covenants are not promises sufficient to support an otherwise enforceable agreement.

**Memorandum Opinion and Order and Preliminary Injunction - Page 21**

payment to Martin if the employment relationship ended "for any reason," as set forth in Section 3(a) of the Employment Agreement, *see* Def.'s App. 6, is a non-illusory promise. *Cf. id.*; *Light*, 883 S.W.2d at 646. For his part, Martin promised, among other things, to submit to mandatory arbitration of certain disputes, as set forth in Sections 15 and 7; agree not to disclose certain confidential information, as set forth in Section 5(a); and to return all records, property, and information upon cessation of his employment, as set forth in Section 5(b). *Cf. Guy Carpenter & Co., Inc.*, 334 F.3d at 465; *Strickland*, 97 S.W.3d at 839. Martin also agreed to the lump sum payment set forth in Section 3(d), and the minimum payment set forth in Section 3(a). Because the Employment Agreement contains non-illusory promises serving as "otherwise enforceable agreements" between the parties, *Light*'s "otherwise enforceable agreement" test is satisfied.

The court next considers whether the covenant not to compete, containing the noncompetition and nonsolicitation covenants, was "ancillary to or part of" an otherwise enforceable agreement. To pass muster, the otherwise enforceable agreement must give rise to the "interest worthy of protection" by the covenant not to compete. *Light*, 883 S.W.2d at 647. In determining whether a covenant not to compete is ancillary to an otherwise enforceable agreement, courts must consider whether (1) the consideration given by the employer in the otherwise enforceable agreement gives rise to the employer's interest in restraining the employee from competing; and (2) the covenant is designed to enforce the employee's consideration or return promise in the otherwise enforceable agreement. *Id.*; *see also Guy Carpenter & Co., Inc.*, 334 F.3d at 465.

The court determines that the nonsolicitation/noncompete provision fails *Light*'s "ancillary to or part of" requirement and therefore does not comply with section 15.50(a). CRI contends that the payment of the $2500 noncompetition bonus to Martin for every month he continued to work

for CRI was specifically designed as consideration in exchange for Martin's promise not to compete, and therefore gave rise to its interest in restraining Martin from competing.  The court has already determined that CRI's promise to pay noncompetition bonuses to Martin is illusory.  Even if such promise could support an otherwise enforceable agreement, however, the court agrees with Martin that the payment of such bonuses cannot give rise to an "interest worthy of protection" by the nonsolicitation and noncompetition covenants.  *Cf. Light*, 883 S.W.2d at 647.  Unlike "business goodwill and confidential or proprietary information," *see id.*, noncompetition bonus payments are not an interest "worthy of protection" by the non-solicitation and noncompetition covenants.  *Cf. Trilogy Software*, *Inc. v. Callidus Software*, *Inc.*, 143 S.W.3d 452, 463 (Tex. App.–Austin 2004, pet. denied) ("[F]inancial benefits do not give rise to an interest worthy of protection by the covenant not to compete.") (quotations and citations omitted); *Strickland*, 97 S.W.3d at 839.

CRI also contends that it promised, presumably in the Employment Agreement, to give Martin confidential and proprietary information, as well as trade secrets, and that such consideration is an interest worthy of protection by the nonsolicitation and noncompetition covenants.  Although such information and trade secrets are an interest worthy of protection, *cf. Light*, 883 S.W.2d at 647, the court explained previously that CRI did not explicitly promise in the Employment Agreement to provide Martin with confidential or proprietary information, or trade secrets, in exchange for his promise not to solicit current or pending customers of CRI or to compete against it.  *Cf. id.* n.14.  At the March 14, 2006 hearing, Ms. Curtis testified that she did not see where in the Employment Agreement CRI promised to give Martin confidential or proprietary information, or trade secrets.  Moreover, as stated previously, the record is devoid of evidence that CRI gave Martin such information or trade secrets at the time the Employment Agreement was executed, or shortly

thereafter.  CRI argues that because Section 1(a)(1) of the Employment Agreement provided Martin new responsibilities as CEO, such new responsibilities necessarily imply increased exposure or additional access to confidential or proprietary information, or trade secrets.  This is far from either an explicit promise to give, or a contemporaneous exchange of, such information or trade secrets. *Cf. Olander*, 363 F.3d at 565; *Olander*, 172 F.Supp.2d at 854; *Light*, 883 S.W.2d at 647 n.14.  Absent either a promise, or a contemporaneous exchange by CRI, that Martin may have eventually acquired confidential or proprietal information or trade secrets, or acquired them before the Employment Agreement was executed, is of no moment.  *See Olander*, 172 F.Supp.2d at 854.  Because CRI did not promise to give, or actually give, confidential or proprietary information, or trade secrets, to Martin at the time the Employment Agreement was executed, or shortly thereafter, there is no otherwise enforceable agreement based on the confidentiality/nondisclosure covenant in Section 5(a) for which the nonsolicitation and noncompete covenants may be "ancillary to or part" of.  *Cf. Olander*, 363 F.3d at 565-66; *Light*, 83 S.W.2d at 647 n.14.

Finally, the parties' exchanges of promises regarding Martin's entitlement to a lump sum payment if CRI terminated him for a reason other than "Cause," as set forth in Section 3(d), *see* Def.'s App. 7, and Martin's entitlement to a minimum payment if the employment relationship ended "for any reason," as set forth in Section 3(a), *see id.* 6, are not otherwise enforceable agreements giving rise to an "interest worthy of protection" by the nonsolicitation and noncompetition covenants.  *Cf. Light*, 883 S.W.2d at 647; *Trilogy Software*, *Inc.*, 143 S.W.3d at 463.

CRI has failed to demonstrate that the nonsolicitation and noncompetition covenants are ancillary to or part of an otherwise enforceable agreement.  *See* Tex. Bus. & Com. Code § 15.50(a); *Light*, 883 S.W.2d at 647.  Because the first prong of the *Light* test has not been satisfied, the

nonsolicitation and noncompetition covenants are unenforceable under section 15.50 of the Texas Business and Commerce Code, and the court need not reach the second prong of the *Light* test, which concerns an analysis of the reasonableness limitations. *See Olander*, 172 F.Supp.2d at 855; *Strickland*, 97 S.W.23d at 839.

> **b.      Confidentiality/Nondisclosure Covenant & Return of Property Covenant**

"[A] non-disclosure agreement may be enforceable even if a covenant not to compete is not." *Tom James of Dallas, Inc*. *v*. *Cobb*, 109 S.W.3d 877, 888 (Tex. App.–Dallas 2003, no pet.).  Under Texas law, nondisclosure provisions are more readily enforced than noncompete covenants "because the non-disclosure provisions are not restraints on trade, they do not prevent the employee from making use of the general experience he acquired during employment, and they do not offend public policy."  *Olander*, 172 F.Supp.2d at 852; *see also CRC-Evans Pipeline Int'l, Inc. v. Myers*, 927 S.W.2d 259, 265 (Tex. App.–Houston [1st Dist.] 1996, no writ).  In other words, "[n]on-disclosure covenants do not necessarily restrict a former employee's ability to compete with the former employer, but instead, prevent only the disclosure of trade secrets and confidential information acquired by the former employee." *CRC-Evans Pipeline Int'l, Inc*., 927 S.W.2d at 265. In analyzing the exchange of consideration supporting a nondisclosure provision, courts are not confined to look only "at the time the agreement is made," as section 15.50 requires for noncompetition provisions. *Olander*, 172 F.Supp.2d at 856; *CRC-Evans Pipeline Int'l, Inc*., 927 S.W.2d at 265.  This means that the court may consider any confidential and proprietary information, as well as trade secrets, CRI may have given Martin before, during, and after the Employment Agreement was executed.

CRI contends that Martin has disclosed or threatens to disclose CRI's confidential, nonpublic information and trade secrets, including information about running a relocation business and

sensitive client information, in violation of the confidentiality/nondisclosure provision contained in Section 5(a).[16]  It also contends that Martin took or otherwise possesses 24 files containing leads for prospective clients that went missing near the time that Martin's employment ended, and asserts that the information in these files qualifies as trade secrets.  Moreover, CRI contends that Martin has refused, and continues to refuse, to return all such information to CRI upon the end of the employment relationship, including the 24 missing files and a laptop computer and cellular telephone owned by CRI.  Martin counters that he has not breached the confidentiality/nondisclosure covenant found at Section 5(a) and that he did not take and does not possess the 24 missing files. At the March 14, 2006 hearing, Martin acknowledged that he had not returned the laptop or the cellular telephone, but stated he would return the items if CRI covered the transport costs.

The court first turns to CRI's contention that Martin breached Section 5(a)-(b) by taking, and failing to return, the 24 missing files containing leads for prospective clients.  A trade secret is "any formula, pattern, device or compilation of information used in one's business, and which gives an opportunity to obtain an advantage over competitors who do now know or use it."  *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1123 (5th Cir. 1991), *aff'd*, 505 U.S. 763 (1992).  To qualify as a trade secret the information cannot be generally known by others in the same business nor readily ascertainable by an independent investigation.  *Zoecon Indus. v. American Stockman Tag Co.*, 713 F.2d 1174, 1179 (5th Cir. 1983); *see also Hogan Sys., Inc. v. Cybresource Int'l, Inc.*, 158 F.3d 319, 324 (5th Cir. 1998).

---

[16]CRI contends that Section 7 of the Employment Agreement entitles it to injunctive relief for a "threatened" breach of Sections 5 and 6.  Martin does not dispute this.  Section 7 provides, in relevant part, that CRI shall be entitled to injunctive relief restraining Martin from "any actual or *threatened* breach of Sections 5 and 6 . . . ."  Def.'s App. 9 (emphasis added).  The court interprets this language to mean that if there is a threatened breach of either Section 5 or 6, CRI may pursue injunctive relief.  In other words, the word "and" in the phrase "Sections 5 and 6" should not be interpreted conjunctively in all circumstances.

To determine whether a trade secret exists, Texas courts apply a six-factor test:

(1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of the measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003).  Courts must "weigh the factors in the context of the surrounding circumstances," and "the party claiming a trade secret should not be required to satisfy all six factors because trade secrets do not fit neatly into each factor every time."  *Id*. at 740.

It is undisputed that the 24 missing files contained information concerning prospective, as opposed to actual, clients.  Items such as "customer lists, pricing information, client information, customer preferences, buyer contacts, [and] market strategies" may qualify as trade secrets.  *T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc.*, 965 S.W.2d 18, 22 (Tex. App.–Houston [1st Dist.] 1998, pet. dism'd); *Miller Paper Co. v. Roberts Paper Co.*, 901 S.W.2d 593, 601 (Tex. App.–Amarillo 1995, no writ).

The court is satisfied, for purposes of the preliminary injunction stage, that CRI has established that the information contained in the 24 missing files deserves trade secret status.  At the March 14, 2006 hearing, CRI presented evidence that it took reasonable precautions to prevent the unauthorized disclosure of the contents of the files.  Moreover, the court received testimony that the files contained information concerning CRI's contact history with the prospective clients, specific contact references and details about such persons obtained through conversations, and the stage of development of potential relocation deals.  The court also received testimony that the information contained in the files can take years to develop, and that CRI had expended a large amount of effort

and money developing and obtaining the information.  Accordingly, CRI has established that the information is valuable proprietary information that provides it with an advantage over its competitors in the corporate relocation industry.

As Section 5 provides that Martin "shall keep secret and confidential indefinitely all non-public information (including, without limitation, information regarding customers . . . ," *see* Def.'s App. 8, the court is satisfied that the information in the missing files falls under the ambit of information contemplated by the parties to be confidential.  Finally, the court is satisfied that the contents of the files are not readily ascertainable by independent investigation or generally known by others in the relocation industry.  Martin contends that the information contained in the missing files is not confidential or a secret because contact information for potential leads may be found in relocation industry directories.  Even when the court assumes that the names and contact information of the prospective clients are readily available through industry journals and therefore generally known within the corporate relocation industry, the court determines that the other information contained in the files, including CRI's documented contact history with the potential clients and the stage of development of potential deals, is information that CRI compiled through its efforts that is not generally known or readily ascertainable.  *See Zoecon Indus.*, 713 F.2d at 1179.  Accordingly, the court determines that, at the preliminary injunction stage, the information contained in the files deserves trade secret status.[17]

The court also determines that CRI is substantially likely to establish, based upon circumstantial evidence, that Martin took the 24 files or otherwise possesses them.  The court heard

---

[17]Regardless of whether the information contained in the 24 missing files qualifies for trade secret status, the court is satisfied that such information is confidential pursuant to Section 5(a) of the Employment Agreement, to which the parties expressly agreed.

**Memorandum Opinion and Order and Preliminary Injunction - Page 28**

testimony from Ms. Curtis that the files were last seen at CRI on January 9, 2006, in the office of Donna Martin, Martin's wife, a sales associate for CRI.  Curtis testified that Martin's wife began leave pursuant to the Family and Medical Leave Act (the "FMLA") on January 9, 2006.  The court also heard testimony from Martin that he began a three-week vacation around January 9, 2006. Martin testified that he did not take and does not otherwise possess the missing files, and that, to his recollection, he did not know that files were missing on or after January 9, 2006.  While the testimony on this issue is divergent, there is a strong circumstantial connection, which appears to be more than mere coincidence at this stage, between the date the files were last seen, when Martin's wife began FMLA leave, and when Martin started his vacation.

Moreover, evidence regarding Martin's communications with Americorp a/k/a Altair, a competitor of CRI, provides additional support that CRI is substantially likely to succeed in establishing a breach of contract claim based upon Martin's violation of the confidentiality/nondisclosure covenant.  At the March 14, 2006 hearing, the court learned that CRI and Altair are engaged in litigation in a Texas state court.[18]  Martin testified that he spoke with the President of Altair subsequent to CRI filing the instant lawsuit against him, and asked the President if he could retain Altair's counsel to represent him in the instant lawsuit.[19]  At the hearing, CRI proffered an e-mail sent by Martin to James Curtis, the founder and former President of CRI, dated February 5, 2006, shortly after Martin's employment with CRI ended on February 1, 2006.  The e-mail provides, in relevant part, "Sorry Ron [the first name of Martin's personal attorney] is

---

[18]The parties have provided little information concerning the pending litigation between CRI and Altair. As stated *supra* n.12, for purposes of this memorandum opinion and order, the court declines to address whether Martin breached the defense of claims provision, found at Section 8 of the Employment Agreement.

[19]Martin testified that the President of Altair referred him to Altair's counsel, but that he did not use said counsel.

immediately proceeding with the tax issues you understand as well as Altair, formerly Americorp.

Regret you have chosen this path.  It is what it is Jim."  *See* Pl.'s Ex. 2 from the Mar. 14, 2006 Hr'g.

Kathy Curtis testified that the "tax issues" referred to an allegation by Martin that CRI had violated

tax laws, and that the confidential information Martin accessed while working for CRI served as the

basis for his knowledge and disclosure of the tax issues.  Martin acknowledged that he sent the e-

mail, and that he did so out of concern for his own liability.

The court determines that Martin's February 5, 2006 e-mail is evidence that Martin disclosed

confidential information as contemplated by Section 5(a) of the Employment Agreement, and

therefore supports a showing that CRI has a substantial likelihood of success on the merits of a

breach of contract claim based upon Martin's alleged violations of the confidentiality/nondisclosure

covenant.[20]

Finally, the court determines that CRI is substantially likely to succeed on the merits of a

breach of contract claim based upon Martin's violation of the return of property covenant.  On

February 1, 2006, CRI sent Martin a letter stating, among other things, "[p]lease immediately return

all company property in your possession, including both computers, to Corporate Relocation's main

office."  Pl.'s Ex. 4 from Mar. 14, 2006 Hr'g.  The parties presented conflicting testimony

concerning the CRI property Martin currently possesses.  Kathy Curtis testified that Martin currently

possesses the 24 missing files, a laptop computer, a cellular telephone, and various company

materials including financial documentation, quarterly reports, sales materials, and e-mails and

---

[20]The court also heard divergent testimony regarding whether Martin gained access to CRI's secured facility late in the evening on January 29, 2006, and arranged for confidential documents to be sent via facsimile without CRI's authorization.  As CRI's counsel acknowledged at the hearing that no present irreparable harm resulted from the alleged incident, the court will not consider evidence concerning the alleged incident for purposes of this memorandum opinion and order.

faxes, and that he has failed to return any of this property, which CRI owns.  Martin acknowledged that he received the February 1, 2006 letter, but that he has not returned the laptop computer and cellular telephone, which he stated are the only property he possesses that CRI owns.

Section 5(b) of the Employment Agreement provides that Martin will promptly return to CRI "any and all records, documents, physical property, information, computer disks, or other materials . . . ."  Def.'s App. 8.  The court has already determined that CRI is substantially likely to establish by circumstantial evidence that Martin took the 24 missing files or otherwise possesses them.  Even when the court assumes that all of Martin's statements are true, however, Martin's acknowledgment that he possesses a laptop and cellular telephone owned by CRI, which appear to qualify as "physical property," is strong evidence supporting CRI's contention that he breached the return of property covenant as set forth in Section 5(b) of the Employment Agreement.

The court is satisfied that CRI has demonstrated a substantial likelihood of success on the merits of a breach of contract claim based upon Martin's alleged violations of the confidentiality/nondisclosure covenant and the return of property covenant, as set forth in Section 5(a)-(b) of the Employment Agreement.

### 2.    Substantial Threat of Immediate and Irreparable Harm

Martin contends that CRI has an adequate remedy at law because it may be compensated for any alleged injuries, and points out that CRI projects lost revenues from the 24 missing prospective client files to be approximately $750,000 to $2 million.  Loss of confidential information is a harm that is difficult to verify and quantify.  *See American Express Fin. Advisors*, *Inc. v. Scott*, 955 F.Supp. 688, 693 (N.D. Tex. 1996).  The court notes, for example, that Kathy Curtis testified she had to speculate in order to project a lost revenue figure for the missing files.  Moreover, "where

trade secrets and goodwill are involved, the threat is significant that the harm experienced by the misappropriation or misuse of trade secrets will be irreparable . . . and damages are impossible to calculate." *Id.* (citations omitted); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Stidham*, 658 F.2d 1098, 1102 n.8 (5th Cir. 1981).

The court also determines that the damages or harm suffered from Martin's disclosure of confidential or proprietary information, or trade secrets, to Altair cannot be quantified at this time, since litigation between CRI and Altair apparently remains pending, and the effect of any such disclosure, including disclosure of the "tax issues," is not fully known. Finally, Martin acknowledged CRI's right to pursue injunctive relief for threatened breaches of Sections 5 and 6. *See* Empl. Agmt. § 7, Def.'s App. 8. Although the court has determined that Section 6 is unenforceable, CRI nevertheless asserted threatened breaches of Sections 5 and 6, thereby triggering its right to seek the extraordinary remedy of, among other things, a preliminary injunction. For these reasons, the court finds that this requirement has been satisfied.

### 3.    Balancing of Harms

The court determines that CRI has demonstrated that greater injury will result from denying its request to enjoin Martin from disclosing its confidential and proprietary information, and its trade secrets, and to order Martin to return CRI's property, than from granting such request. Martin would remain relatively unaffected were the court to enforce the confidentiality/nondisclosure covenant contained in Section 5(a). At the March 14, 2006 hearing, Martin testified that he has no problem

refraining from disclosing confidential information as it is defined in the Employment Agreement, and also testified that he could work for a competitor of CRI without disclosing such information.[21]

Martin would also remain relatively unaffected were the court to enforce the return of property covenant contained in Section 5(b).  Martin has agreed to return the laptop and cellular telephone if CRI will arrange for transport.  Moreover, if Martin does not possess the 24 missing prospective client files or any other confidential or proprietary information, or trade secrets of CRI, then he suffers no harm by the issuance of an injunction.  *Cf. Oxford Global Res., Inc. v. Weekley-Cessnun*, 3:04-CV-330-N, 2005 WL 350580, at *3 (N.D. Tex. Feb. 8, 2005).  Accordingly, the court finds that this requirement has been satisfied.

### 4.      Public Interest

Finally, the court examines whether the issuance of a preliminary injunction will disserve the public interest.  The court determines that the public has an interest in knowing and understanding that agreements between parties will be honored, that contracts will be enforced, and that confidential information and trade secrets will not be disclosed.  The public also has an interest in knowing and understanding that persons who breach their agreements may not profit or otherwise benefit from such conduct.  The court, therefore, finds that this requirement has been satisfied.

As CRI has demonstrated a substantial likelihood of success on the merits with respect to its breach of contract claim concerning Martin's violations of the confidential/nondisclosure covenant and the return of property covenant, that it will suffer immediate and irreparable harm without such relief, that a greater injury will result from denying the preliminary injunction than

---

[21]In light of Martin's statement, one could argue that it is unnecessary to issue a preliminary injunction enjoining Martin from disclosing information falling under the ambit of Section 5(a) of the Employment Agreement; however, to ensure that the status quo is preserved until CRI's breach of contract claim is fully arbitrated, the court will issue such relief.

from granting it, and that the preliminary injunction will not disserve the public interest, the court will issue a preliminary injunction to maintain the status quo pending arbitration of CRI's breach of contract claim.

### III.      Conclusion and Preliminary Injunction

For the reasons stated herein, the court **denies** Plaintiff's Motion for Leave to File Plaintiff's First Amended Complaint; **grants in part** and **denies in part** as herein set forth Defendant's Rule 12(b)(1) Motion to Dismiss and to Compel Arbitration; **orders** that Plaintiff's breach of contract claim be submitted to arbitration pursuant to 9 U.S.C. § 3 and in accordance with the terms of the Employment Agreement; **stays** all further proceedings in this action pending arbitration pursuant to 9 U.S.C. § 3; and **grants in part** and **denies in part** Plaintiff's Application for Temporary Restraining Order and for Injunctive Relief by modifying the relief requested to comport with the determinations made herein and ensure that the injunction merely preserves the status quo during the arbitration process.  The court hereby **issues** a preliminary injunction and **enjoins and prohibits** Defendant Robert Martin from:

A.      Directly or indirectly disclosing or using in any manner CRI's trade secrets and other confidential or proprietary information, including, but not limited to:

   i.      CRI's methods of conducting business, the financial condition and performance of the company and its supporting financial relationships, vendor lists and relationships, revenue sources, discount information, pricing information, profit and loss statements, financial statements, revenue recognition models, contract terms, costs of doing business, costs associated with particular services, profit margins, fees, billing and reporting methods, strategic marketing and sales programs, budgeting and forecasting information, domestic and international supplier networks, and employee information.

      ii.    Confidential information relating to CRI's clients, including client contact, client satisfaction, client discounts, contract terms, including pricing information, the contracts which CRI is currently negotiating with potential clients and vendors, and any other confidential client information; and

      iii.   Strategy for obtaining business from any prospective clients of CRI including contracts, pricing, terms of negotiations, and marketing strategies and any documents relating thereto.

B.    Destroying, discarding or erasing any documents or materials (whether in hard copy, stored electronically or otherwise) regarding CRI or CRI's confidential, trade secret or proprietary information, including clients, prospective clients, products, services, financial information, costs, business plans, budgets or forecasts, pricing, marketing strategies, or personnel; and

C.    Destroying, discarding, erasing or modifying the 24 missing prospective client files described in this memorandum opinion and order and injunction.

As part of this preliminary injunction, the court also **directs** Martin to provide all CRI documents and materials in his possession, custody, or control, including the 24 missing files to the extent applicable, to CRI's counsel **no later than fourteen days** after issuance of this order and injunction. CRI **shall** bear the cost of transporting the laptop computer and cellular telephone; Martin **shall** bear all other transport costs.  Martin **may** enjoy employment in the corporate relocation industry, subject to all terms and conditions set forth in this preliminary injunction.

      This preliminary injunction **shall remain in effect** pending the arbitration of Plaintiff's breach of contract claim, or until it is otherwise modified by this court.  The court hereby **sets a bond** in the amount of $15,000, and this preliminary injunction shall not become effective until

Plaintiff Corporate Relocation, Inc. tenders to the clerk of the court the sum of $15,000 cash, or a bond for $15,000 in a form approved by the clerk of the court, in compliance with Fed. R. Civ. P. 65(c).[22]

      **It is so ordered** this 12th day of September, 2006.


Sam A. Lindsay
United States District Judge

---

[22]Section 7 of the Employment Agreement provides that a bond or other security shall not be required. *See* Def.'s App. 9. Fed. R. Civ. P. 65(c) directs that "[n]o . . . preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper . . . ." The Fifth Circuit has held that a district court "may elect to require no security at all," *Corrigan Dispatch Co. v. Casa Guzman*, S.A., 569 F.2d 300, 303 (5th Cir. 1978), but did so before the Supreme Court decided *W.R. Grace & Co. v. Local Union 759, Int'l Union of the United Rubber, Cork, Linoleum & Plastic Workers of Am.*, 461 U.S. 757, 770 n.14 (1983) ("A party injured by the issuance of an injunction later determined to be erroneous has no action for damages in the absence of a bond."). Fifth Circuit decisions issued subsequent to *W.R. Grace & Co.* vary whether an injunction may issue without bond or other security. *Compare Phillips v. Chas. Schreiner Bank*, 894 F.2d 127, 131 (5th Cir. 1990) ("[F]ailure to require the posting of a bond or other security constitutes grounds for reversal of an injunction.") (citation and quotation omitted) *and Continuum Co., Inc. v. Incepts, Inc.*, 873 F.2d 801, 803 (5th Cir. 1989) *with EOG Res., Inc. v. Beach*, 54 Fed. Appx. 592, at *1 (5th Cir. 2002) (adopting *Corrigan*) *and Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir.) (adopting *Corrigan* in context of an antisuit injunction), *cert. denied*, 519 U.S. 821 (1996). To the extent the parties contracted that CRI could obtain relief "without any bond or other security being required," Def.'s App. 9, the court determines that such promises do not square with Fed. R. Civ. P. 65(c), and will not be honored. *Cf. Phillips*, 894 F.2d at 131; *Continuum Co. Inc.*, 873 F.2d at 803. Even if this court has the authority to issue a preliminary injunction without requiring a bond or other security, given the factual and procedural history of this action, the court determines that a $15,000 bond is an appropriate security for costs and damages Martin may incur or suffer in the event he is found to have been wrongfully enjoined. Accordingly, the court imposes a bond of $15,000 pursuant to Fed. R. Civ. P. 65(c).

**Memorandum Opinion and Order and Preliminary Injunction - Page 36**